IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA



| UNITED STATES (SEC), | : |
| PLAINTIFF, | : |
| | : |
| VS. | : CASE # 03-0831-KJD-RJJ (D. NV). |
| | : |
| SMALL CAP RESEARCH, INC., ULYSSES THOMAS | : CERT. MAIL# 7003 1680 0005 1205 8738 |
| WARE, ET AL., | : |
| DEFENDANTS. | : 7003 1680 0005 1205 8738 |
| | : |

**EXHIBIT #31:** IN SUPPORT OF DKT. #107, 122, 136, 153, 155, 159, AND
EMERGENCY MOTIONS 2.0, 3.0, 4.0, 5.0, AND 6.0.

**PURPOSE OF EXHIBIT:** An eye witness account of the systematic extortion and looting of Group Management Corp., a publicly-traded company, by officials and employees of the United States Department of Justice (David Kelly, Michael J. Garcia, Preet Bharara, Alexander H. Southwell, Steven Peiken, Steven D. Feldman, Nickilos S. Goldin, Maria E. Douvas, David Makol, Maria Font, Glenn Fine, and others known and unknown; employees and officials of the Securities and Exchange Commission to wit: Spencer C. Barasch, Jeffrey B. Norris, Robert Khuzami, H. David Kotz, John C. Martin, Robert Hannan, Rebecca R. Fairchild, Stephen Webster, Stephen Korotash, Angelina Stewart, and others known and unknown;

federal judges to wit: Dennis G. Jacobs, Peter W. Hall, Amalya L. Kearse, Robert D. Sack, Robert A. Katzmann, Barrington D. Parker, Jr., Rosemary S. Pooler, Reena Raggi, Richard C. Wesley, Chester W. Straub, Kent J. Dawson, William H. Pauley, III, Robert W. Sweet, Leonard B. Sand, Thomas W. Thrash, Jr., Orinda D. Evans, Julie E. Carnes, Linda T. Walker, George H. Carley, and others known and unknown;

all collectively known as (the "Unindicted Co-conspirators") operating as an association-in-fact, as defined at 18 USC §1961(4, 5), and a continuing criminal enterprise, (the "CCE") conducting racketeering activities as defined at 18 USC §1961 et. seqs., in New York, NY, Atlanta, GA, Las Vegas, NV, and elsewhere, since from beginning from 2001 continuing to the present, using the instrumentalities of interstate commerce, and the federal courts of the United States.

Submitted by Counsel

*Ulysses Thomas Ware* (signature)

Ulysses Thomas Ware
Reg. No. 56218-019
Atlanta Prison Camp
P.O. Box 150160
Atlanta, GA 30315
04/25/2012 11:28:21 AM

## CONTENTIONS

1. The petitioner, Mr. Ware, contends that the Securities and Exchange Commission, (the "SEC"), via unadmitted counsel, did in fact in its frivolous complaint, (DKt. #1), at ¶¶30, 31, and 33, (the "SEC Judicial Admissions"), pled the SEC out of court in <u>SEC v. Small Cap Research, Inc., et al.</u>, 03-0831-KJD-RJJ (D. NV), ("0831").

2. The petitioner further contends that the SEC's Judicial Admissions made on behalf of the United States, the real party in interest, in 0831, and <u>U.S. v. Ware</u>, 04-Cr-1224 (RWS)(SDNY), ("1224"), and 05-Cr-1115 (WHP)(SDNY), ("1115"), were collateral estoppel and res judicata on the United States and its <u>privies</u> (the SEC, the United States Attorney (SDNY), SEC Branch Chief Michael McAullief (who testified on behalf of the SEC in 1115); Jeffrey B. Norris (who testified on behalf of the SEC in 1224); and all SEC officials and employees; as well as official and employees of the Department of Justice). Cf. <u>Federated Dept. Stores, Inc. v. Moities</u>, 452 U.S. 394, 396-400 (1981) (res judicata bindings on the parties and their privies, binding on all courts, and there are no exceptions).

3. The petitioner contends that SEC Branch Chief (Michael McAulieff), was prohibited by res judicata and collateral estoppel from testifying in 1115, on behalf of the SEC, from contradicting the SEC's Judicial Admissions made in 0831 in regard to Investment Technology, Inc.; and (2) SEC senior trial lawyer Jeffrey B. Norris, was prohibited from testifying in 1224 on behalf of the SEC in contradiction to the SEC's Binding Judicial Admissions made in 0831.

4/26/2012

## SUMMARY OF THE ARGUMENT

The petitioner, Mr. Ware, has argued and proved that the SEC and the USAO, privies of the United States, were both barred by res judicata, and collateral estoppel from contradicting the SEC's judicial admissions made in its 0831 complaint (Dkt. #1 at ¶¶ 30, 31, and 33); judicial admissions which pled the SEC out of court in 0831, as a matter of law -- the press releases of INZS were not actionable, civilly or criminally.

The SEC's 0831 judicial admissions, made on behalf of the real party in interest, the Executive Branch, were not subject to dispute or review by any court (the 0831, the 1115 or the 1224 courts); and furthermore, prohibited the USAO-SDNY, from establishing any probable cause with respect to INZS in 1115.

The law of the case established by District Judge Leonard B. Sand with respect to the 02-CV-2219 (LBS)(SDNY), ("2219"), proceedings, (Dkt. #50), prohibited the SEC from permitting Norris from testifying in 1224 in conflict with SEC national policy (SEC Release 33-7190 and SEC IR 5121), regarding the statutory underwriter status of the 2219 plaintiffs judicially admitted by their attorney of record in the 2219 complaint (Dkt. #1 at ¶¶ 10-21).

The SEC, the USAO, District Judges Sand, Sweet, Pauley, and Dawson, along with Circuit Judges Parker, Pooler, Raggi, Hall, Katzmann, and Jones, all colluded and conspired to frame Mr. Ware, while knowing that the SEC pled itself out of court in 0831, the actual "law of the case" in 2219 was established by the adoption of the 2219 plaintiffs' judicial admissions, (¶¶10-21), from their complaint (Dkt. #1), into District Judge Sand's 11/25/2002 (Dkt. #50) Memorandum Opinion -- which the adverse portions were not appealed by the 2219 plaintiffs; and all knew that the 1224 indictment did not charge an **offense** against the laws of the United States prohibiting the [ ] 1224 prosecution, cf. 18 USC §3231 and 28 USC §547(1).

Moreover, all SEC and DOJ employees (privies of the United States) were bound by the res judicata and collateral estoppel effect of the SEC's judicial admissions, and the Executive Branch's 10/07/2008 Double Jeopardy Political Decision to abandon

4/26/2012

1115; as well as being bound by the USAO's 1224 indictment which pled the United States out of court in 1224, as a matter of law.

4/26/2012

## SWORN STATEMENT OF UNDISPUTED MATERIAL FACTS.
### 04/25/2012 AFFIRMATION

I Ulysses Thomas Ware, under oath and subject to the penalty of perjury, and 28 USC §1746, hereby make this affirmation, having personal knowledge of the same make and state the following statement of facts:

¶1

I hereby incorporate by reference as if set forth fully herein Dkt. #153 the April 6, 2012 sworn statement of indisputable material facts; (2) and Dkt. #158 (Ex. #28) Affirmation of Ulysses Thomas Ware dated 04/15/2012.

¶2

The United States Attorney (SDNY), (the "USAO"), at trial in 1115, called as a witness for the United States SEC Branch Chief, Michael McAulieff, while knowing, or recklessly not knowing that the USAO's charges in the 1115 indictment regarding INZS were barred by collateral estoppel and res judicata based on the SEC's Judicial Admissions made in 0831.

¶3

The USAO admitted in its fraudulent response brief filed in U.S. v. Ware, 07-5222-Cr (2d Cir.), at P. 4, the USAO solicited the "testimony of an SEC employee [McAulieff] about various background principles" inconsistent with the SEC's Judicial Admissions and collateral estoppel. Cf. EX. #1 attached hereto.

¶4

On 11/07/2008 the USAO (U.S. Attorney Michael J. Garcia, deputy chief of appeals AUSA Andrew L. Fish, and AUSA Nicholas S. Goldin, (the "USAO Co-conspirators"), knowingly, deliberately, willfully, and intentionally, filed a material false, fraudulent, fabricated, and manufactured appeal brief on behalf of the United States, to obstruct justice, commit a fraud on the court, and to kidnap Mr. Ware in violation of 18 USC §§2, 4, 201, 241, 242, 371, 891-94, 1201-02, 1343, 1346, 1505, 1510, 1621-23, 1956-57, and 1961-64, (the "Racketeering Offenses"), to aid, abet, and to directly participate, as an association-in-fact, as defined in 18 USC §1961(4), in furtherance of the activities of the continuing criminal enterprise, (the "CCE") run from within

the USAO, the SEC, the federal courts in New York, Atlanta, GA, Las Vegas, NV, and elsewhere.

¶5

The USAO, on 11/07/2008, after abandoning the appeal rights of the United States at P. 2* of its brief, (Ex. #1 at P. 2), the USAO Co-conspirators lied, committed, perjury, and committed a fraud on the court, while knowing they were bound by collateral estoppel and the SEC's Judicial Admissions, and while knowing they had abandoned ¶115, told the following lies to a federal appeals court in regard to INZS' press releases at P. 7 §2 ("Ware 'pumped' up interest in both stocks by issuing false and misleading press releases ...."); P. 16 §4 ("As part of his campaign to artificially increase demand for ... [INZS] ...."); P. 16 §5 ("The press releases drive up the price and volume of [INZS] ... stock."); Id. ("the price and volume of [INZS] ... stock increased after these press releases were issued."); P. 17 §6 (" ... Ware was artificially inflating its [INZS] ... share price ....").

¶6

The USAO Co-conspirators further lied, committed perjury, and obstructed justice, while operating as an association-in-fact with Circuit Judges Kearse, Sack, Hall, and District Judge Pauley, at P. 31 (EX. #1 at P. 7), and made the bold faced lie when lying and stating the following:

> Moreover, evidence of the correlation between the issuance of fraudulent press releases and increases in the price and volume of [INZS] ... (see, e.g. [the fabricated stock-price chart evidence prepared by FBI analyst Maria Font under the direction of AUSA Alexander H. Southwell, which use has subsequently been outlawed by the Second Circuit in U.S. v. Ferguson, 653 F.3d 83 (2d Cir. 2011)] GX 92-A, 92-B, 92-C, GX 93-A, 93-B) supported the jury's conclusion that the false information in the press releases was material. (emphasis added).

¶7

The USAO knew that the SEC had judicially admitted in their 07/14/2003 complaint (Dkt. #1) at ¶¶30, 31, and 33, the INZS press releases had no affect on the price of INZS' stock price, yet in the bogus and fabricated 11/07/2008 appeals brief, lied,

4/26/2012

committed perjury, and obstructed justice, while knowing the USAO was bound by res judicata, and collateral estoppel -- as a privy of the United States -- from contradicting the SEC Judicial Admissions.

¶8

The USAO admitted, P. 33-34 (EX. #1 at P. 8), of its bogus and fraudulent appeals brief, that it did in fact use at trial the prohibited stock-price chart evidence (GX 92 and GX 93 series), which according to Ferguson, Id at 75 violated the substantial rights of Mr. Ware, and was an abuse of discretion by another co-conspirator (District Judge William H. Pauley, III), to allow the stock-price chart evidence into the bogus and manufactured 1115 trial:

> In fact, the Government offered both direct evidence that the press releases caused investors to purchase stock [], as well as powerful circumstantial evidence that Ware's fraudulent press releases caused the spike in the volume of [INZS] and [SVSY] stock. The evidence included charts overlaying (a) historical price and volume data for [INZS] and [SVSY] stock and (b) the timing of press releases. These ["overly prejudicial" (quoting Ferguson, Id. at 75) showed that after Ware issued positive press releases, trading volume and, **in some cases**, the stock price surged. (emphasis added).

¶9

The USAO, at P. 40-41 of its fraudulent brief (Ex. #1 at P. 9), admitted that it was aware of the 0831 proceedings; and aware of the foolish and fraudulent rulings of District Judge Dawson, which were contaminated by the CCE's fraud and corruption.

The USAO further admitted in regard to District Judge Dawson's fraudulent 0831 rulings, "The SEC attorney assigned [by Spencer C. Barasch, who bribed District Judge Pauley] to litigate the SEC Case was Jeffrey B. Norris."

¶10

The USAO further admitted at P. 66-67 of its fraudulent and criminally fraudulent appeals brief (Ex. #1 at P. 10), that the USAO did in fact make use of the SEC employee McAuliffe at trial (Tr. 97-107, 128), to testify in contradiction to the SEC Judicial Admissions made in 0831 in regard to INZS -- the SEC had already conceded in 0831, which was binding on McAuliffe (a privy of the SEC -- an employee) -- the

4/26/2012

SEC lacked a case or controversy with respect to securities fraud pertaining to the INZS press releases.

¶11

The USAO and the SEC knew that they were both bound by res judicata and collateral estoppel, and the SEC Judicial Admissions from admitting any evidence regarding INZS into the 1115 and 1224 trials, cf. P. 81-82 of the USAO's fraudulent brief (Ex. #1 at P. 11), where the USAO admitted it used the SEC's "trading data" regarding INZS to enhance Mr. Ware's sentence by +12 levels, while knowing that the SEC had in its fraudulent 0831 complaint (¶¶30, 31, and 33), judicially admitted the INZS press releases had no affect on INZS' stock price -- there was no gain or loss in regard to INZS or SVSY, as admitted by the SEC, and admitted by the USAO when admitting the markets for both INZS and SVSY were not efficient (S. Tr. 75-76).

¶12

Reducing Mr. Ware's fraudulent sentence in 1115 by the +12 levels imposed based on INZS and SVSY's gains and losses, reduces Mr. Ware base offense level from 30 to 18, with a criminal history of category 1, Mr. Ware, would have received a sentence of 27-33 months, even assuming that Mr. Ware was guilty, which Mr. Ware vehemently denies.

¶13

Further reducing Mr. Ware's sentence by -4 levels based on the fact that there were not victims in regard to INZS and SVSY -- the SEC admitted there were no losses attributed to Mr. Ware -- the sentence is further reduced from level 18 to level 14, yielding a sentence of 15-21 months, even if Mr. Ware was guilty, which he again denies.

¶14

Reducing Mr. Ware by an additional -4 levels (§3B1.1(a)) where the SEC had already concluded on 07/14/2003, when it filed the 0831 complaint that Jones, Epps, Sadler, or Williams, were involved in any criminal activities, reduced the fraudulent from level 14 to level 10, yielding a sentence of 6-12 months, even assuming Mr. Ware

4/26/2012

was guilty, which is in contradiction of the SEC's Judicial Admissions, in contradiction to District Judge Pauley's 10/12/2007 (S. Tr. 31) Fatico Decision, and in contradiction to the USAO's Executive Branch Article II, §3 Double Jeopardy Political Decision made at P. 2* (Cf. Ex. #1 at P. 2), of the fraudulent USAO's appeal brief. to abandon 1115 for insufficient evidence.

¶15

Further reducing the fraudulent sentence by -4 levels (§2B1.1(b)(2) for 50 or more victims regarding INZS and SVSY where the SEC's Judicial Admissions, and AUSA Steven D. Feldman's 10/12/2007 (S. Tr. 36 L 11-23; 46 L 13-16; 62 L 17 - 65 L 23) admissions that the market was never aware of any securities fraud regarding SVSY -- there were no victims -- the sentence is reduced from level 10 to level 6 yielding a sentence of 0-6 months in home confinement, even assuming Mr. Ware was guilty, which in in contradiction to the SEC's Judicial Admissions, i.e., the USAO is prohibited from arguing the guilty or innocence, as is its privies (the SEC in 0831).

¶16

Further reducing the sentence by -2 levels (§3C1.1) for Mr. Ware allegedly obstructing the SEC's 0831 investigation regarding INZS -- which requires an "official" investigation, rather than an investigation to assist the USAO to violate the Constitution's Due Process Clause, the sentence is reduced from level 6 to level 2 yielding a sentence of 0-6 months.

¶17

As a result of the United States 11/07/2008 Double Jeopardy Political Decision (cf. Id. at P. 2), both the SEC and USAO, on behalf of the United States (the real party in interest), are prohibited from arguing the guilt of Mr. Ware in regard to 0831 or 1115, in any respect -- the SEC (a privy of the USA) is prohibited from arguing Mr. Ware committed securities fraud in 0831 with respect to INZS; and the USAO is prohibited from arguing that Mr. Ware was guilty of securities fraud or conspiracy in 1115; and the SEC and USAO were both prohibited from arguing in 1224, that Mr. Ware obstructed the INZS proceedings.

(5)

4/26/2012

¶18

Norris, was prohibited from testifying in 1224 because: (1) the 1224 indictment failed to charge an **offense** against the laws of the United States, i.e., it is not an offense for a securities lawyer (Mr. Ware), in compliance with SEC national policy (SEC Release 33-7190 and SEC IR 5121), to not issue fraudulent Rule 144(k) legal opinions to the 02-CV-2219 (LBS)(SDNY), ("2219") plaintiffs (admitted Section 2(a)(11) statutory underwriters (cf. Ex. #30:0831 at P. 4-5, 9-10)); the 1224 district court was prohibited from accepting Norris' perjurious and fraudulent testimony on behalf of the SEC, when the SEC had pled itself out of court on 07/14/2003 (Dkt. #1 at ¶¶ 30, 31, and 33); and (3) the SEC was required to bring an enforcement action against the 2219 plaintiffs, the **convicted felon** Edward Grushko, Esq., Barbara R. Mittman, Esq., Kenneth A. Zitter, Esq., Ari Rabinowitz, and others known and unknown for admitting they issued fraudulent legal opinions regarding GPMT's securities, and admitted selling unregistered securities of GPMT.

¶19

The law of the case with respect to 2219, as found in District Judge Sand's 11/25/2002 (Dkt. #50), which the 2219 plaintiffs did not appeal, was binding on the 2219 plaintiffs, and their privies (Rabinowitz, Zitter in 1224); and furthermore, the 2219 plaintiffs' judicial admissions (Dkt. #1 at ¶¶10-21), were binding on the 2219 plaintiffs and their privies (Zitter, Rabinowitz, Mittman, Grushko, District Judge Sand, District Judge Sweet, Circuit Judges Parker, Pooler, Raggi, Hall, Katzmann, and Jones) with respect to U.S. v. Ware, 09-0851-Cr, 11-2151-Cr, and 11-4181-CV.

¶20

The law of the case in regard to 2219, (Dkt. #50), was binding on the SEC, Norris, Zitter, Rabinowitz, the USAO, District Judge Sweet, at trial and on appeal from 1224; and was binding on the USAO in its bogus appeal brief at P. 40-41 (Ex. #1 at P. 9).

4/26/2012

¶21

The Second Circuit's U.S. v. Ware, 09-0851-Cr panel (Circuit Judges Parker, Pooler, and Raggi), (the "Panel"), committed a fraud on the court, obstructed justice, and conspired to kidnap, and did in fact kidnap Mr. Ware by the fraudulent entry of the July 21, 2009 order in 0851 finding that 2219 and 1224 were the same case.

¶22

The Panel's July 21, 2009 finding that 2219 and 1224 were in fact the same case, i.e., "law of the case" with respect to Alpha Capital, AG, et al. v. IVG Corp., et al., 02-CV-2219 (LBS)(SDNY), in the appeal filed regarding the August 13, 2003 (Dkt. #65) order of the 2219 court, collaterally estopped Mr. Ware in 1224 from challenging the purported 11/25/2002 (Dkt. #50) decision.

¶23

The Panel's July 21, 2009 decision was fatally flawed for the following reasonings: (1) District Judge Sand, contrary to the Panel's inverted disjointed reasoning, in Dkt. #50, in fact adopted the 2219 plaintiffs' judicial admissions taken from the 2219 complaint (¶10-21) which were taken from the 2219 plaintiffs' subscription agreement (¶10.1(iv)), cf. ¶13 of the 2219 complaint.

¶24

District Judge Sand, thus, found as the "law of the case" the judicial admissions made by the 2219 plaintiffs' -- concessions not open to dispute by the Panel, or the 2219 plainitffs -- which bound the Panel in the April 2009 motion to dismiss filed by Mr. Ware with respect to the 1224 indictment.

¶25

Furthermore, the July 21, 2009 ruling by the Panel established the "law of the case" in later stages of 09-0851, i.e., 11-2151-Cr, and in the Rule 33 motion filed by Mr. Ware in 1224 -- 2219 and 1224 were in fact the same cases.

¶26

The Panel's legal conclusions that 2219 and 1224 were in fact the same cases (cf. Ex. #11 at Dkt. #142:0831), triggered double jeopardy barring 1224 from being

4/26/2012

prosecuted.

¶27

Furthermore, the Panel's conclusion that law of the case in regard to 03-7973-CV (which resulted from 08/13/2003 (Dkt. #65), 2219 order regarding Alpha Capital, AG), prevented it from dismissing the 1224 indictment, never mind the indisputable fact SEC Release 33-7190 prohibited any issuance of Rule 144(k) legal opinions to the 2219 plaintiffs; and never mind the fact that the 2219 plaintiffs admitted (¶13 of the 2219 complaint) of in fact being statutory underwriters, never mind the fact that District Judge Sand found as the "law of the case" in 2219 at Dkt. #50, P. 1-4, that the 2219 plaintiffs were governed by ¶10.1(iv) of the subscription agreement -- the 2219 plaintiffs were not **bona fide investors** in GPMT, but were in fact dealers and underwriters, prohibited from any statutory exemptions to Section 5 of the 1933 Act, in all practical purposed terminated 09-0851-Cr for double jeopardy reasons.

¶28

The Panel's July 21, 2009 decision in essence found that the 2219 plaintiffs were agents of the United States Department of Justice (a rather silly notion).

¶29

The decision also found that Kenneth A. Zitter, Esq., was acting on behalf of the United States Executive Branch, in violation of 28 USC §547(1).

¶30

The decision also found that the burden of proof was beyond a reasonable doubt in 2219.

¶31

The decision necessarily found that the 2219 complaint was equivalent to an indictment.

¶32

The decision necessarily found that since 2219 and 1224 were in fact the same case, then 1224 was a civil case, prohibiting an criminal sanctions from being imposed on Mr. Ware.

¶33

The decision necessarily found the 2219 proceedings were required to have been tried to a jury of twelve.

¶34

The decision necessarily found that the orders entered in 2219 on which the 1224 indictment was purportedly predicated, were null and void, where a directed verdict of guilty cannot be entered by the trial judge in the 1224 civil proceeding.

¶35

The decision necessarily decided that the 1224 court improperly instructed the jury it could return a verdict of guilty on the 1224 civil complaint; and the 1224 court improperly entered a criminal sentence in the 1224 civil proceeding.

¶36

The 03/02/2012 ultra vires order entered in 11-2151-Cr, again found that "law of the case" prevented the Second Circuit from dismissing the bogus 1224 indictment, both the 07/21/2009 and the 03/02/2012 orders necessarily found, that 2219 and 1224 were in fact the same case, and therefore, the 1224 indictment was civil in nature, rather than criminal.

¶37

The 11-2151-Cr Court's 03/02/2012 order finding that 2219 and 1224 were in fact the same cases, which was not signed by the purported Circuit Judge who entered the decision consistent with the 07/21/2009 09-0851-Cr Panel's decision, necessarily found that the 1224 court's proceedings were conducted in violation of the Constitution.

¶38

Circuit Judges Parker, Pooler, and Raggi, rigged the 09-0851-Cr proceedings to protect the ill-gotten gains realized from the extortion of the 2219 defendant (GPMT), at the hands of District Judge Sand, **fugitive** Thomas Badian, **convicted felon** Edward D. Grushko, Esq., U.S. Attorneys David Kelly, Michael J. Garcia, and Preet Bharara, who all allowed Ari Rabinowitz, and Kenneth A. Zitter, Esq. to testify under oath in 1224 of primary criminal violations of the federal securities laws.

(9)                                                          4/26/2012

¶39

Circuit Judges Parker, Pooler, and Raggi **fixed** the 09-0851-Cr proceedings regarding Mr. Ware's motions to dismiss the 1224 indictment (which failed to charge an **offense**), by committing an insidious <u>fraud</u> on the court, i.e., adversely affected and corrupted the judicial machinery, to prevent a party from a fair and impartial adjudication of the merits of his claims -- "a deep-seated favoritism which made fair judgment impossible." (emphasis added).

¶40

The "deep-seated favoritism" of Circuit Judges Parker, Pooler, and Raggi, was derived from the extra-judicial source as participants in the criminal association-in-fact as defined by 18 USC §1961(4), to conduct contracted for racketeering activities as defined at 18 USC §1961(a) et seqs., i.e., racketeering to obstruct the order administration of justice, and conspiring to do the same in service to the CCE.

¶41

Circuit Judges Hall, Katzmann, and District Judge Jones (sitting as an appellate judge, assigned by Chief Judge Jacobs to assists the CCE), (the "11-2151-Cr Panel"), **rigged** and **fixed** the 2151 proceedings while knowing the 2151 court lacked 28 USC §1294(1) statutory territorial subject matter jurisdiction to review, on the merit, issues pertaining to <u>government</u> trial exhibits GX 250-253 (bankruptcies filed in the Northern District of Georgia, within the <u>Eleventh</u> Judicial Circuit).

¶42

The 2151 Panel knew that the issues decided against the 2219 plaintiffs with respect to government trial exhibits (GX 250-253), issues which were not appealed by the 2219 plaintiffs to the District Court (N.D. GA), or the Eleventh Circuit, were res judicata and collateral estoppel on the 2219 plaintiffs, the 2219 court, the 1224 court, the USAO, and the Second Circuit.

¶43

The 2151 Panel knew that the 2219 civil suit, and the 1224 criminal prosecution, both were initiated in violation of the SEC's national policy regarding issuing Rule

4/26/2012

144(k) legal opinions to the 2219 plaintiffs, admitted 15 USC §77b(a)(11) statutory underwriters. Cf. SEC Release 33-7190 and SEC IR 5121; and <u>Berckeley Investment Group, Ltd. v. Colkitt</u>, 455 F.3d 195, 220 (3d Cir. 2006) (Citing SEC Release 33-7190 Section 2(a)(11) statutory underwriters must register all distributions pursuant to Section 5 of the 1933 Act).

¶44

The Second Circuit Court of Appeals has committed a fraud on the court, adversely affect the judicial machinery due to the extra-judicial corruption regarding **fugitive** Thomas Badian and **convicted felon** Edward D. Grushko, Esq., and the New York investment bank (Ladenburg Thalmann & Co., Inc.), who all have engaged in the systematic extortion of hundreds of small publicly traded companies -- which generated the ill-gotten gains of the CCE -- used to facilitate the racketeering activities of the CCE, aided, abetted, and with direct participation of Department of Justice officials and employees, and employees and officials of the SEC, federal judges, and private persons.

¶44

Racketeers Ari Rabinowitz, a government witness at trial in 1224, testified under oath to committing <u>criminal</u> violations of the federal securities laws, yet SEC Enforcement Director Robert Khuzami has not initiated an enforcement action against Rabinowitz, Grushko, Zitter, or Barbara R. Mittman, Esq., who drafted and submitted counterfeit Rule 144(k) legal opinions to the 2219 court regarding the 2219 plaintiffs' attempt to extort GPMT of more than 9.0 million free-trading shares.

¶45

The SEC, the USAO, the New York, Las Vegas, NV, and Atlanta, GA federal courts have turned a blind eye and deaf ear to the <u>criminal</u> frauds committed by Zitter, Dennis S. Meir, Esq., John W. Mills, Esq., and Kilpatrick, Townsend, & Stockton, LLP, in regard to GPMT Chap. 11 filed in 2003 in Atlanta, GA; the frauds and violations of the securities laws by the same committed during the 2219, 1224, 0851, and 2151 proceedings; and Atlanta, GA 2003 bankruptcy proceedings of GPMT.

(11)

4/26/2012

¶46

The SEC's Enforcement Director Robert Khuzami, in collusion and conspiring with the CCE, and the expectation of future financial gains resulting from exiting the SEC to a high paying job, (cf. former SEC Inspector General H. David Kotz, Esq. immediate resignation after Mr. Ware filed Dkt. #107 in 0831; cf. former SEC Regional Director Spencer C. Barasch, Esq. immediate settlement with the DOJ immediately after Mr. Ware filed Dkt. #107 in 0831), has obstructed justice by refusing to initiate civil and criminal enforcement actions against primary participants in the CCE's extortion scheme to pillage publicly traded company, and the rape of the shareholders of, according to the sworn testimony of government witness in 1224 (Ari Rabinowitz, Tr. 199-230), "a good few hundred [small companies he and the 2219 plaintiffs extorted]." (emphasis added). Cf. Ex. #29 filed in 0831 for the notification to Director Khuzami of the extortion of publicly traded companies more than three (3) years ago, and not a single action brought against any person involved in the CCE.

¶47

The SEC's civil enforcment mechanism in collusion with the DOJ's criminal prosecution mechanism, in conspiring with the judicial machinery (cf. Alexander Hamilton's prescience in the 78th Federalist of the dangers of the Executive and Judicial branches colluding), have and [ ] currently have a stranglehold on the prosecution of admitted _criminal_ violations of the federal securities laws, to the detriment of the public capital markets.

¶48

The SEC, rather than enforce SEC national published policy contained in SEC Release 33-7190 and SEC IR 5121, and prosecute the 2219 plaintiffs, permitted Jeffrey B. Norris, Esq. (a purported senior trial lawyer with the SEC) to testify under oath in 1224, on behalf of the SEC, in a fraudulent criminal prosecution where a securities lawyer was criminally charged by the New York USAO for **not violating SEC national policy**, and assisting the criminal extortion of his client, the 2219 defendant (GPMT), of more than +$18 million in free-trading securities.

4/26/2012

¶49

As of today (04/26/2012), neither SEC Director of Enforcement Robert Khuzami, nor the U.S. Attorney Preet Bharara, have indicted or civilly prosecuted any person involved in the systematic extortion of 2219 defendant GPMT (the 2219 complaint provides the <u>judicial admissions</u> of the culprits to initiate the prosecutions).

¶50

Robert Khuzami and Preet Bharara, both acting in collusion, conspiring, and racketeering, with the CCE, the <u>fugitive</u> Thomas Badian, and **convicted felon** Edward Grushko, Esq., Kenneth A. Zitter, Esq., Ari Rabinowitz, Circuit Judges Parker, Pooler, Raggi, Hall, Kearse, Sack, Katzmann, Wesley, Straub, Jacobs, District Judges Jones, Sand, Pauley, Sweet, Trager, Underhill, Dawson (D. NV), Thrash (N.D. GA), Carnes (N.D. GA), Evans (N.D. GA), Magistrate Judge Linda T. Walker (N.D. GA), Supreme Court Justice George H. Carley, and others known and unknown, (the "Judicial Racketeers"), have all obstructed the orderly administration of justice to protect the ill-gotten gains of the CCE, by the fraudulent criminal prosecution of Ulysses Thomas Ware in 1115, 1224, and in 0831, because Mr. Ware refused to violate SEC national policy (SEC Release 33-7190 and SEC IR 5121) and issue +$18 million in free-trading securities of GPMT to the CCE's 2219 plaintiffs (Alpha Capital, AG; Markham Holdings, Ltd.; Stonestreet, L.P.; and Amro International, S.A.).

I Ulysses Thomas Ware, under oath, pursuant to the penalty of perjury, and pursuant to 28 USC §1746, have this 25th day of April, 2012 in the city of Atlanta, GA, set my hand and seal, and have made the forgoing statement having personal knowledge and personal understanding of the facts and laws, and have personally witnessed the criminal conduct of the persons named above in furthering the activities of the continuing criminal enterprise run from within the federal courts, the SEC, and the Department of Justice to extort publicly-traded companies and their shareholders of billions in ill-gotten gains.

Ulysses Thomas Ware
04/25/2012 10:33:58 AM
Atlanta, GA 30315
Atlanta Prison Camp
601 McDonough St., SW
Atlanta, GA 30315

(13)

4/26/2012

EXHIBIT #1: EXCERPTS OF UNITED STATES' 07-5222 APPEAL BRIEF.
FILED IN <u>U.S. v. WARE</u>, SECOND CIRCUIT.

individuals who worked in Ware's office suite during the relevant time period; eight press releases promoting Service Systems stock and 24 press releases promoting Investment Technology stock, all of which were issued at Ware's direction and with his prior approval; documentation showing that Investment Technology and Service Systems each agreed to pay, and in fact paid, free-trading stock to Ware in return for Ware's purported investment advisory and legal services; public SEC filings made by Investment Technology and Service Systems showing that both companies were in poor financial condition; testimony of three individuals who purchased Investment Technology stock as Ware was fraudulently driving up its stock price and trading volume; testimony of an SEC employee about various background principles; and testimony of a Federal Bureau of Investigation analyst concerning the correlation (a) between the timing of Ware's fraudulent press releases and increases in the trading volume and share price of Investment Technology and Service Systems stock, and (b) between increases in the trading volume and share price of Investment Technology and Service Systems stock and Ware's sales of his stock.

## 1. Ware Obtains Freely-Tradeable Investment Technology And Service Systems Stock

Ware is a securities attorney. He operated a small firm — both physically and in terms of employees — that held itself out as a law firm and investment bank. Ware ran the firm from an office suite in Atlanta. Although Ware called the firm "Rosenfeld, Goldman & Ware" ("RGW") and

claimed that "Rosenfeld" and "Goldman" were partners in the firm's purported New York office, three men who worked in RGW's office suite never saw or spoke to either "Rosenfeld" or "Goldman" or saw any indication that these "partners" in fact existed. Ware alone was in charge of RGW's operations: he hired employees; to the extent his employees were paid, he paid them; and he told his employees what to do. (Tr. 294, 297-98, 305, 669, 698-99, 730-31).*

In late 2001, Ware hired two young men struggling to make it in the securities business: a 24-year old named Jeremy Jones and a 25-year old named Carleton Epps. Both Jones and Epps previously had worked at a small securities firm called Jackson Schanklin & Sonia ("JSS"). At the time Jones and Epps worked at JSS, JSS leased space from Ware in RGW's office suite. (Tr. 294-97, 723, 725-26, 730).

After hiring Jones and Epps, Ware gave them an assignment: search the internet for small publicly traded companies with "reasonable" trading volume and share prices below one dollar and find out whether these companies wanted help from Ware with promoting their stock, raising capital, and legal matters. Ware wanted payment from these companies in the form of cash or "Form S-8"

---

* "Tr." refers to the transcript of the retrial; "First Trial Tr." refers to the transcript of Ware's first trial, which resulted in a mistrial; "SA" refers to the Supplemental Appendix; and "GX" refers to Government Exhibits offered into evidence at the retrial.

William H. Pauley III, United States District Judge, and a jury.*

Indictment S1 05 Cr. 1115 (WHP) (the "Indictment") was filed on September 14, 2006, in two counts. Count One charged Ware and Jeremy Jones with conspiring to commit securities fraud and wire fraud, in violation of Title 18, United States Code, Section 371. Count Two charged Ware and Jones with securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

Ware's first trial began on January 15, 2007. Ware, a securities attorney, represented himself pro se with the assistance of standby counsel appointed under the Criminal Justice Act. On January 23, 2007, Judge Pauley declared a mistrial at Ware's request after one of the Government's witnesses fell critically ill during a weekend recess in the course of his testimony.

Ware's retrial began on April 16, 2007, with Ware again representing himself with the assistance of standby counsel. On April 30, 2007, the jury found Ware guilty on both counts.

On October 26, 2007, Judge Pauley sentenced Ware to a term of 97 months' imprisonment, to be followed by

* The Government filed a notice of appeal but is not pursuing a cross-appeal.

three years of supervised release, and imposed a $25,000 fine, $228,388 in forfeiture and a $200 special assessment.

Ware is serving his sentence.

## Statement Of Facts

### A. The Government's Case

The evidence at trial established that, from approximately December 2001 through approximately April 2002, Ware orchestrated a "pump and dump" scheme designed to artificially inflate the market demand and market price for the stock of two small, publicly traded companies, Investment Technology, Inc. ("Investment Technology"), and Service Systems International, Ltd. ("Service Systems"). Ware inflated the price of Investment Technology and Service Systems stock by issuing and causing others to issue fraudulent press releases regarding the companies. After issuing the fraudulent press releases, Ware sold stock in those companies, earning in four months a total profit of more than $200,000.

The United States Securities and Exchange Commission ("SEC") began to investigate the manipulation of the market for Investment Technology stock. In an effort to thwart the investigation, Ware provided one of his former employees with a false affidavit claiming that one of Ware's fraudulent press releases had been distributed by mistake. Ware instructed the employee to sign it, and then submitted the false affidavit to the SEC.

The evidence at trial included the testimony of Ware's former employees, who testified pursuant to cooperation and nonprosecution agreements; the testimony of other

4/26/2012

6

stock, which is stock that is freely tradeable without restriction as soon as it is received. (Tr. 299-302, 737-40).

Jones and Epps then made cold calls to various small companies pitching Ware's services. Although Epps found several potential clients, they wanted to pay Ware in restricted stock, and Ware rejected them. But Jones found two companies — Investment Technology and Service Systems — that wanted Ware's services and were willing to pay him in Form S-8 stock. Investment Technology purportedly was in the online gambling business; Service Systems was in the water purification business. Both companies were publicly traded. (Tr. 306, 740, 743, 776).

Investment Technology and Service Systems each entered into consulting agreements with RGW. Ware signed on behalf of RGW. Both companies agreed to pay RGW in advance in return for its purported services in Form S-8 stock. Both companies also filed SEC registration statements and related attorney opinion letters on behalf of the companies. (Tr. 753; GX 3, GX 4, GX 11, GX 61, GX 62, GX 63, GX 70, GX 71).

This payment arrangement was improper, because SEC regulations prohibit a company from using Form S-8 stock to pay for services relating to promoting that company's stock. (Tr. 114-15). The relevant SEC regulation was readily available; for example, Epps checked the SEC website and quickly found and understood this restriction on using Form S-8 stock to pay for services related to stock promotion. Unlike Ware, Epps was neither a securities attorney nor the head of a purported law firm and investment bank. (Tr. 303-04).

7

Ware arranged for the Form S-8 shares that Investment Technology and Service Systems agreed to pay RGW to be deposited in accounts under his control. Between January 28, 2002, and March 21, 2002, a brokerage account in the name of "MW Financial Services" received a total of 7.5 million shares of Investment Technology stock. (GX 100-A, GX 100-B). On November 23, 2001, a brokerage account in the name of "RGW Financial Group, Inc." received 2.5 million shares of Service Systems. (GX 104-T). Ware controlled both of these accounts.*

## 2. Ware Issues Fraudulent Press Releases

After receiving Investment Technology and Service Systems stock, Ware "pumped" up interest in both stocks by issuing false and misleading press releases that created a market of buyers to whom Ware would later sell his shares.

_____

* MW Financial Services was the name of a defunct credit counseling company that Myron Williams, one of Ware's employees, had tried launching. Ware instructed Williams to open this account; the account address was Ware's law office; and Ware instructed Williams when and how much stock to sell in the account. (Tr. 899; GX 100-A). Account documents for the RGW Financial Group, Inc. listed Ware as the president, vice president, treasurer, and secretary of RGW Financial Group, Inc. (GX 104-T).

#### 4. Ware Instructs His Employees To Tout The Stocks On Message Boards

As part of his campaign to artificially increase public demand for Service Systems and Investment Technology stock, Ware also instructed Epps and Jones to post "snippets" from the press releases and other positive comments about these stocks on internet message boards that focus on stock market investing. (Tr. 346-47; 795-96).

#### 5. The Press Releases Drive Up The Price And Volume Of Investment Technology And Service Systems Stock

The positive statements in these press releases and web site postings had precisely the effect that Ware intended: the price and volume of Investment Technology and Service Systems stock increased after these press releases were issued.

For example, on January 30, 2002, Investment Technology stock closed at $.025 per share with 800,100 shares traded. Ware issued a press release touting Investment Technology on February 4, 2002. That day, the share price closed at $.05 with 1.1 million shares traded — a 1334 percent increase in volume from the last trading day. Ware issued additional press releases for Investment Technology on February 5, 6, 7, and 8, 2002. On February 8, 2002, trading volume increased by 107 percent. Ware issued additional press releases on February 12, 13, 14, and 15, 2002. On February 15, 2002, volume increased by 124 percent. (GX 31-R, GX 32-B, GX 33-B, GX 34-B, GX 35-B, GX 36-B, GX 37-B, GX 38-B, GX 39-B, GX 92, GX 92-A).

Service Systems's trading history reflects a similar correlation between the timing of Ware's press releases and price and volume. For example, on December 3, 2001, Service Systems stock closed at $.14 per share with 146,100 shares traded. Ware issued press releases touting Service Systems stock on December 6, 10, and 11, 2001. On December 11, 2001, the stock closed at $.22 cents per share with 670,600 shares traded — a 177 percent increase in volume from December 10, 2001. (GX 20-R, GX 21-R, GX 22-R, GX 93).

In an email to Service Systems dated January 11, 2002, Ware observed that the "strategy" — using the press releases to increase the stock price — was working: "Gentlemen as you can see the bid is steadily rising back to its previous levels after of positive P/R [sic] . . . . currently the bid has risen 40% since our P/R of Thursday . . . . the market is positive on the prospects for the company . . . . . . . . . In the last two days there has been only one sale for 2,500 shares. Our strategy will definitely work if everybody does their part on the team." (GX 66 (elipses in original), SA 141). In other words, the press releases were having the intended effect of driving up the stock price. (Tr. 773-74).

#### 6. Ware "Dumps" His Investment Technology And Service Systems Stock

Three unsuspecting investors who bought Investment Technology stock during the time period when Ware was artificially inflating its trading volume and share price testified at trial.

could have inferred that these facts were material. That is, if an investor had known that the press releases had not been issued by multiple independent entities, but rather by a single firm that had been paid for stock promotion in free-trading stock, the investors would have been less likely to credit the press releases.

Further, the jury had ample evidence to conclude that Ware conspired to issue, and did in fact issue, press releases with materially false information about the business operations and prospects of Investment Technology and Service Systems to deceive investors. For example, Ware issued a press release touting the fact that that Investment Technology had accepted more than 100,000 wagers for more than $4 million in connection with the February 3, 2002 Superbowl, even though Investment Technology had no operations as of that date. Even after being confronted with the fact that Investment Technology's chief executive officer complained that the press release was false and that, in truth, the company had no revenue at all, Ware did not retract the press release. Instead, he approved and issued numerous additional press releases touting Investment Technology stock as a strong buy.

There was sufficient evidence that the false press releases were material to investors. In order for information to be "material," there must be a substantial likelihood that a reasonable investor would view it as significantly altering the "total mix" of information available. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir. 1991) ("An omitted fact is material if there is a substantial

likelihood that a reasonable shareholder would consider it important in making an investment decision."). In this case, one investor testified that he purchased Investment Technology stock based solely on the press releases and news that Ware disseminated. (Tr. 68). Moreover, evidence of the correlation between the issuance of fraudulent press releases and increases in the price and volume of Investment Technology and Service Systems stock (*see, e.g.*, GX 92-A, 92-B, 92-C, GX 93-A, 93-B) supported the jury's conclusion that the false information in the press releases was material.

Ware's knowledge that the press releases were false was further confirmed by his own actions: at the very time Ware was issuing these positive press releases, he was selling his own stock in these companies. Indeed, Ware sometimes sold blocks of this investment Technology stock on the very same day that he approved press releases proclaiming that Investment Technology stock was poised for tremendous growth. As one stark example, on the very day that he issued a press release claiming that Service Systems was going to triple in value in five trading days, Ware sold some of his Service Systems stock.

The public SEC filings of Investment Technology and Service Systems provided further support for the jury's conclusion that Ware knew the press releases contained false and misleading information. These filings stated, in essence, that these companies had no income, no operations, and substantial losses. The jury was entitled to infer that Ware, a securities attorney who was purportedly retained to perform stock promoting and capital raising

advisory services for Investment Technology and Service Systems, knew what was in these filings.

There was also overwhelming proof that Ware intended for these press releases to drive up the price of Investment Technology and Service Systems stocks. For example, Ware told Epps and Jones that it was important to keep the press releases coming to move up the stock. In addition, in his January 2002 email to Service Systems, as his press releases were driving up the volume and price of the stocks, Ware wrote that "the bid is steadily rising back to its previous levels after of positive P/R ... Our strategy will definitely work if everybody does their part on the team." (GX 66 (ellipses in original), SA 141). Ware thus acknowledged that the "strategy" of using positive press releases to drive up the price, or "bid," that buyers were willing to pay for these stocks was working.

Ware's knowing participation in a scheme to defraud was further confirmed by the fact that he duped Williams into signing a false affidavit, which Ware then provided to the SEC in order to conceal his fraudulent scheme. In the affidavit, Ware had Williams falsely claim that Williams had inadvertently distributed a draft of the press release that claimed that Investment Technology had taken in millions of dollars in Superbowl bets and that Williams had been told that Business Wire would retract it. The jury reasonably could have inferred that Ware procured this bogus explanation for one of the most patently false press releases because he knew this press release was incriminating and wanted to deflect suspicion away from him.

Finally, the scheme undeniably involved the use of interstate wires. Williams transmitted the press releases to

Business Wire over the internet from Atlanta to New York and elsewhere. Business Wire distributed the press releases electronically to subscribers around the world, including to Bloomberg LP, which electronically distributed them to its own subscribers around the world.

In his brief, Ware challenges the sufficiency of the evidence by identifying several categories of evidence that the Government did not present. For example, Ware complains that the Government did not have any management personnel or auditors from Investment Technology or Service Systems or any forensic accountants testify that any of the statements in the press releases were false or misleading. The Government, however, is not obligated to prove its case according to the preferences of the defendant or, for that matter, in any particular way with any particular type of evidence. *Cf. United States v. Saldarriaga*, 204 F.3d 50, 52 (2d Cir. 2000) ("The jury correctly was instructed that the government has no duty to employ in the course of a single investigation all of the many weapons at its disposal, and that the failure to utilize some particular technique or techniques does not tend to show that a defendant is not guilty of the crime with which he has been charged."). As set forth above, the evidence (including Ware's false press release claiming that Investment Technology had received $4 million in Superbowl bets, when, in reality, it had no operations), amply supported a finding that Ware's press releases were materially false.

Ware also wrongly claims that there was no evidence that the volume or price of either Investment Technology or Service Systems stock was artificially inflated or that

34

the press releases had any impact on the trading of the companies' stock. In fact, the Government offered both direct evidence that the press releases caused investors to purchase stock (see, e.g., Tr. 68), as well as powerful circumstantial evidence that Ware's fraudulent press releases caused the spike in the volume of Investment Technology and Service Systems stock. The evidence include charts overlaying (a) historical price and volume data for Investment Technology and Service Systems stock and (b) the timing of press releases. These charts showed that after Ware issued positive press releases, trading volume and, in some cases, the stock price surged.

For example, on February 4, 2002, Ware issued a press release claiming that Investment Technology's "business model and experienced management gives it a strategic advantage over other gaming companies," that its "operating model will generate top line cash flow and bottom line profits estimated to grow at 30% annually;" and that "[w]e see [Investment Technology] stock price accelerating to the mid $0.40 with the next 2 months on strong volume [sic]." (GX 31-R). Trading volume in Investment Technology stock skyrocketed that day by 1334 percent and the stock price increased by almost 50 percent. Later that week, after Ware had issued another four press releases about Investment Technology, the volume increased by 107 percent. (GX 92-A, SA 144). Similarly, when Ware issued a positive Investment Technology press release on March 18, 2002, the trading volume jumped by 1197 percent. (GX 92-B, SA 145). And in April 2002, after Ware issued favorable Investment Technology press releases on four consecutive days, the trading volume increase by 831 percent. (GX 92-C, SA 146). Similarly,

35

with respect to Service Systems stock, on December 11, 2001, after Ware issued favorable Service Systems press releases over two consecutive days, trading volume in Service Systems stock increased by 177 percent. (GX 93-A, SA 147).

Ware claims that there was no proof that anyone actually relied on Ware's Service Systems press releases in deciding to buy Service Systems stock. That claim is both legally inconsequential and factually inaccurate. First, the Service Systems press releases were at issue only in the conspiracy count (not the substantive count), and the success of the charged conspiracy is not an element of the offense. See, e.g., United States v. Trapilo, 130 F.3d 547, 552 n.9 (2d Cir. 1997). Moreover, actual reliance is not an element of securities fraud or wire fraud. See Neder v. United States, 527 U.S. 1, 24-25 (1999) ("The common law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place under the federal fraud statutes."); United States v. Haddy, 134 F.3d 542, 551 (3d Cir. 1998) (reliance on the deceptive practice by an identifiable victim participating in a securities transaction is not required for conviction). Finally, the Government did offer direct and circumstance evidence of actual reliance. This evidence included the testimony of an investor who actually relied on the Investment Technology press releases and the evidence described above on the correlation between the issuance of the press releases and spikes in the price and trading volume of Investment Technology and Service Systems stock.

Ware also challenges the credibility of witnesses who provided incriminating testimony against him. This

*Management Corp, Thomas Ware, Len Churn and Barry Corker,* 02 Civ. 2219 (LBS) (S.D.N.Y.) (the "Judge Sand Case"); and *United States v. Thomas Ware, a/k/a "Ulysses Thomas Ware,"* 04 Cr. 1224 (RWS) (S.D.N.Y.) (the "Judge Sweet Case"). In his brief on appeal, Ware challenges many of the rulings in these other cases. Because the other cases are not before this Court for review, the Government will not respond to these challenges. For the benefit of the Court, the other cases will be described briefly.

### a. The SEC Case

In July 2003, the SEC office in Fort Worth, Texas filed the SEC Case, a civil securities enforcement action against Ware and others. The SEC Case was filed in the United States District Court for the District of Nevada and assigned to United States District Judge Ken Dawson. Ware represented himself and his co-defendants in that case. The SEC attorney assigned to litigate the SEC Case was Jeffrey Norris.

In October 2004, Judge Dawson entered default judgment against Ware and the other defendants. Judge Dawson found that "[a]ll of [Ware's] arguments are completely frivolous, lacking in fact, and legally irrelevant" and include arguments that are "simply untrue." *Securities and Exchange Commission v. Small Cap Research Group,* 2004 WL 2812108 (D. Nev. Oct. 22, 2004), *aff'd,* 226 Fed. Appx. 656 (9th Cir. 2007). Judge Dawson further found that the "arguments in opposing default are another example of [the defendants'] bad faith supporting this final sanction of default" and noted the defendants' "well-documented misconduct, frivolous

motions, arguments made in bad faith, and dilatory tactics," including conduct that was "willful rather than due to excusable neglect." *Id.* Judge Dawson also found that this conduct had "obstructed the proceedings" and that Ware, despite having been sanctioned for past violations, continued to violate discovery rules and "continued to file motions making even more ludicrous arguments than before." *Id.*

### b. The Judge Sand Case

The Judge Sand case was a civil lawsuit filed in March 2002 in the Southern District of New York. According to the pleadings, in 2001 a group of four investment companies loaned approximately $1.1 million to an entity that was later renamed Group Management Corporation ("GMC"). Under the governing loan agreements, at the request of any of the four investors, GMC was required to convert a portion of the outstanding loan amount into shares of GMC and deliver these shares to the requesting investor. Over time, GMC failed to comply with requests from the investors — called "conversion requests" — that GMC convert the outstanding loan amount into GMC shares.

In May 2002, Judge Sand entered a written order directing GMC to honor the then-outstanding conversion requests. In November 2002, Judge Sand entered judgment in favor of the investors, finding "repeated and willful violations" of the court's orders. On or about March 13, 2003, Judge Sand issued a written order holding GMC and Ware in contempt of court for failing to comply with the November 2002 order and judgment. After further proceedings, on or about August 25, 2003, Judge Sand issued

On appeal, as he did in the District Court, Ware accuses Judge Pauley of accepting a bribe in return for insuring that Ware was convicted, although Ware has not refined his bribe theory beyond the donation to Duke University by a law firm that employs a former SEC attorney. Nonetheless, in return for this bribe, Ware claims that Judge Pauley provided "obstruction of justice services," including even helping the Government pick its trial witnesses against Ware. Ware also continues to implicate Bachner, claiming that he acted as a "second prosecutor" by leaking defense strategy to the Government and possibly even having testified in the grand jury against Ware.

---

To the extent Ware's brief on appeal claims that Bachner's alleged involvement in the conspiracy denied him effective assistance of counsel, that claim should be summarily rejected. Putting aside the sheer absurdity of Ware's conclusory allegations against Bachner, Bachner's unwillingness to make a suppression motion, seeking to suppress evidence from the SEC that Judge Pauley had already ruled was properly obtained does not constitute ineffective assistance. *See United States v. DiTommaso*, 817 F.2d 201, 214-16 (2d Cir. 1987) (Sixth Amendment does not require counsel to file every suppression motion; instead, it is sufficient that counsel exercises professional discretion in deciding whether there are sufficient grounds to file a motion); *see also United States v. Nersesian*, 824 F.2d 1294, 1322 (2d Cir. 1988) (for purposes of effective assistance, only motions "having a solid foundation" need be filed). In any event, after relieving Bachner as counsel, Ware filed *pro se* the very motion he wanted Bachner to

Ware rounds out his conspiracy theory with numerous other conclusory, unsubstantiated claims of misconduct by four Assistant U.S. Attorneys and multiple defense lawyers. Some examples include his claims that a grand

---

file, so Bachner's representation did not prejudice Ware. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984).

As part of the purported conspiracy, Ware also claims that Judge Pauley improperly admitted the testimony of Michael McAuliffe, an SEC branch chief, who testified about various background principles and authenticated some quarterly and annual filings that Investment Technology and Service Systems filed with the SEC. (Tr. 97-107, 128). Ware argues that because McAuliffe did not have personal knowledge of these *particular* public SEC filings, even though he had general familiarity with these types of filings, it was improper for him to read from these documents once they were in evidence. Ware relies on Fed. R. Evid. 602, which provides that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Ware is wrong. First, Ware did not object to the admission of these records when they were offered, and thus his claim is reviewable only for plain error. Second, in any event, these records were certified copies of public records, and thus were self-authenticating. *See* Fed. R. Evid. 902(4). Third, even if they were not self-authenticating, McAuliffe's testimony based on his nine years of experience at the SEC would have been sufficient. Thus, even if the admissibility of this testimony was reviewable only for abuse of discretion, *see United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005)

able estimate of the loss, given the available information." *Id.; see, e.g., United States v. Bennett,* 252 F.3d 559, 565 (2d Cir. 2001). Where the loss amount cannot be reasonably calculated, the sentencing court is permitted to use the gain to the defendant to determine the applicable enhancement. *See* U.S.S.G. § 2B1.1, application note 3(B). A district court's factual finding as to the amount of loss is reviewed only for clear error. *See United States v. Germosen,* 139 F.3d 120, 129 (2d Cir. 1998).

The Government provided the District Court with a list based on trading data obtained by the SEC of all individuals who purchased Investment Technology and Service Systems stock during the period when Ware was distributing the press releases for each company and selling his Form S-8 shares in each company. (SA 157-63). For Investment Technology, this period was January 28, 2002, through April 19, 2002; for Service Systems, it was December 6, 2001, through January 17, 2002. The Government determined the loss sustained by each of these victims by (a) first calculating the dollar value of the shares, if any, held by each victim at the end of the period during which Ware was issuing the press releases; and (b) then reducing this value to reflect the residual value of any unsold stock. The Government calculated this credit for residual value by multiplying the number of shares held by each victim at the end of the relevant time period by an average price for each of the stocks. For Investment Technology, the Government used $0.0017 — the average price of a share for the 30-day period from May 6, 2002, to June 5, 2002. (The SEC suspended trading in Investment Technology stock from April 22, 2002, through May 6, 2002 due to, among other things, concerns about the

accuracy of Ware's press releases). Based on this analysis, investors in Investment Technology lost approximately $313,357.51. For Service Systems, the Government used $0.0432 — the average price of a share from January 18, 2002, through December 5, 2002. Based on this analysis, investors in Service Systems lost of approximately $84,196.34. Accordingly, the Government submitted in the District Court that Ware's fraud caused a total loss to Investment Technology and Service Systems investors of approximately $397,553.85. The Government's calculation did not include investors in these stocks who sold all of their shares before the end of the relevant time period.

With respect to gain to Ware resulting from the scheme, the Government's trial evidence included financial records showing that after Ware pumped up the price and volume of Investment Technology and Service Systems stock, Ware had Myron Williams sell Ware's Form S-8 stock that Ware received at no cost from Investment Technology and Service Systems. These sales generated approximately $228,388 in profit. (GX 90; GX 91).

Thus, as Judge Pauley correctly found, whether measured by the gain to Ware or the loss to the victims, the determinative amount under Section 2B1.1 was more than $200,000 but less than $400,000. Accordingly, Judge Pauley correctly increased the offense level by 12 levels, pursuant to U.S.S.G. § 2B1.1.

## 2. The Enhancement For 50 Or More Victims Was Properly Applied

Ware argues that Judge Pauley improperly increased the Guidelines offense level by four levels to reflect that the offense involved more than 50 victims. This factual finding, however, was supported by the record and was not clearly erroneous.

Guidelines Section 2B1.1(b)(2) provides for a four-level increase in the defendant's offense level if the offense involved 50 or more victims. The Government provided the District Court with a list of 260 investors who bought Investment Technology stock and 123 investors who bought Service Systems stock during the period when Ware was issuing his press releases and selling his own shares in these companies. (SA 157-63). This information was based on trading data obtained by the SEC. Because these investors bought the relevant stock in a market whose volume and share prices was artificially inflated by Ware's press releases, they are all victims of Ware's offenses. Accordingly, Judge Pauley did not clearly err in finding that there were more than 50 victims.

## 3. The Aggravating Role Enhancement Was Properly Applied

Ware argues that Judge Pauley improperly increased the Guidelines offense level under U.S.S.G. 3B1.1(a) by four levels to reflect that he was an organizer and leader of the scheme. As the PSR noted, however, Ware's scheme involved five or more participants (Ware, Jones, Epps, Williams, and the CEO of Investment Technology), and Ware was the "orchestrator" of the crime. (PSR ¶ 53; see

also Government's Sentencing Submission dated August 14, 2007, at 12). Even if Ware's scheme had not involved at least five participants, it was "otherwise extensive," and a four-level leadership enhancement was appropriate.

Under U.S.S.G. 3B1.1(a), a four-level increase in the offense level applies where the defendant was "an organizer or leader of criminal activity that involved five or more participants *or was otherwise extensive.*" (emphasis added). See *United States v. Blount*, 291 F.3d 201, 217 (2d Cir. 2002) (to qualify as "manager or supervisor," defendant must "exercise[ ] some degree of control over others involved in the commission of the offense' ... or 'play[ ] a significant role in the decision to recruit or to supervise lower-level participants.'" (quoting *Elerby v. United States*, 187 F.3d 257, 259 (2d Cir. 1998) (internal citations omitted)).

"[I]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." U.S.S.G. § 3B1.1 App. Note 3. In *United States v. Carrozzella*, 105 F.3d 796 (2d Cir. 1997), this Court held that in "determining whether a criminal activity is 'otherwise extensive' as the functional equivalent of one involving five or more knowing participants," the relevant factors are (i) the number of knowing participants; (ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent; and (iii) the extent to which the services of the unknowing participants were peculiar and necessary to the

criminal scheme. 105 F. 3d at 803-04, *abrogated in part on other grounds, United States v. Kennedy*, 233 F.3d 157, 160-61 (2d Cir. 2000); *see also United States v. Napoli*, 179 F.3d 1, 15 (2d Cir. 1999) (scheme was "otherwise extensive" where defendant used casinos and casinos' personnel to cash and launder checks).

Ware's scheme involved the participation of at least three others (Jeremy Jones, Carelton Epps, and Myron Williams) who Ware employed to find companies that would be willing to exchange free-trading stock for Ware's purported investment advisory and legal services; to prepare the fraudulent press releases and bogus postings on the Internet; and to transmit the press releases for global distribution. The scheme also relied on the CEO of Investment Technology, who was well aware of the fraudulent press releases. (*See, e.g.,* Tr. 340-41, 787). In addition, the scheme also relied on the possibly unwitting but vital assistance from management officials at Service Systems who agreed to issue the Form S-8 stock to Ware; accountants for Service Systems and Investment Technology who consented to the SEC Form S-8 filings; and Business Wire personnel who processed the press releases. Thus, even if the scheme did not involve five or more *knowing* participants, it would have been "otherwise extensive" within the meaning of this Guidelines provision. The four-level enhancement was warranted.

#### 4. The Abuse of Trust Enhancement Was Properly Applied

Ware disputes Judge Pauley's application of the two-level enhancement under the Guidelines for abuse of trust.

The trial record, however, supports the factual finding that triggered the enhancement.

Section 3B1.3 of the Guidelines provides for a two-level enhancement if a defendant "abused a position of public or private trust ... that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. As the relevant commentary explains, "positions of trust"

are "characterized by professional or managerial discretion (*i.e.*, substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions are ordinarily subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (*e.g.*, by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3, Application Note 1.

For this enhancement to apply, "the defendant's position must involve discretionary authority ... entrusted to the defendant by the victim." *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001). "The primary trait that distinguishes a position of trust from other positions is the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Laljie*, 184 F.3d 180, 194 (2d Cir. 1999). A district court's



COPY

4/26/2012

**CERTIFIED MAIL**
PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE

7003 1680 0005 1205 8738
7003 1680 0005 1205 8738

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com™

**OFFICIAL USE**

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Postmark Here

Sent To: Office of the District Clerk (D. NV).
Street, Apt. No.; or PO Box No. 333 Las Vegas Blvd., South
City, State, ZIP+4 Las Vegas, NV 89101

PS Form 3800, June 2002          See Reverse for Instructions

⇔56218-019⇔
Las Vegas District Clerk
RM 1334
333 LAS Vegas BLVD S
U.S. District Courthouse
LAS Vegas, NV 89101
United States

Ulysses Thomas Ware
Reg. No. 56218-019
Atlanta Prison Camp
P.O. Box 150160
Atlanta, GA 30315

Legal Mail

Filed at the Atlanta Prison Camp on 04/26/2012
with correct first class postage prepaid pursuant
to Houston v. Lack, addressed to:

Contents:
Exhibit #31: 04/25/2012 Affirmation regarding
criminal activities of DOJ, SEC, and federal judges
to extort GPMT of +$18 million in free-trading stock

The contents of this document have been photocopied
on 04/26/2012 at the Atlanta Prison Camp for the
official record according to Houston v. Lack.

Please file the contents of this document in
SEC v. Small Cap Research, Inc., et al.,
03-0831-KJD-RJJ (D. NV).

X _Ulysses Thomas Ware (56218)_
Ulysses Thomas Ware
Atlanta, GA 30315
04/26/2012 11:59:53 AM
Certified mail# 7003 1680 0005 1205 8738